**RITCHIE DEVELOPMENT, LTD.**

v.

**Curtis ROYS**

No. CIV.A.MO–01–CA–003.

United States District Court,
E.D. Louisiana.*

July 1, 2002.

---

* Transferred from United States District Court Western District Texas, Midland–Odessa Division.
* Transferred from United States District Court Western District Texas, Midland–Odessa Division.

### ORDER AND REASONS

VANCE, District Judge.

## I. BACKGROUND

Plaintiff Ritchie Development, Ltd. sued Curtis Roys for correction of inventorship, pursuant to 35 U.S.C. § 236. Plaintiff seeks a ruling that Larry Ritchie was the sole inventor of United States Patent No. 5,835,372 ("the '372 patent"), on which Larry Ritchie and Curtis Roys are named as co-inventors.[1] Plaintiff also seeks costs and attorney's fees.

The Court held a bench trial on plaintiff's claims on May 20–21, 2002. Based on the following findings of fact and conclusions of law, the Court determines that plaintiff fails to show by clear and convincing evidence that Larry Ritchie was the sole inventor of the '372 patent.

## II. FINDINGS OF FACT

### A. Background

The '372 patent describes a method and apparatus that measures and controls volume flow through fluid distribution lines. The apparatus is designed to retrofit standard fluid divider valve assemblies. The patent contains 14 claims: the first 6 are apparatus claims and the last 8 are method claims.[2] The resulting technology has been sold under the trademark DNFT, which stands for Digital No–Flow Thermalizer. (Pl.'s Ex. 1, Patent '372.) The DNFT has primary applications in the oil industry where it is used to control lubrication levels in fluid distribution lines. The patent prosecution history reveals that what made the DNFT patentable was

---

1. Larry Ritchie assigned his rights in the '372 patent to Ritchie Development, Ltd. on October 9, 1998. (Def.'s Ex. 61.)

2. The claims of the patent are set forth in Appendix A.

that its method and apparatus allowed fluid to be measured without requiring the fluid to flow through the apparatus itself. (Pl.'s Ex. 2, at tab 13) (distinguishing the DNFT from the subject matter of the *Stillwell et. al. Patent.*) The DNFT contained a "lever arm" that transferred the motion of a piston contained in a separate divider block back to a microprocessor to calculate fluid flow. The advantages of the DNFT were that it was independent of fuel pressure, and it could retrofit onto existing divider block valves and other systems in which fluids are moved with a piston. (*Id.*)

From 1975 until March 1995, Curtis Roys was employed by United Pump & Supply Company ("UP & S"), a company that supplied equipment for monitoring lubrication in divider block lubrication systems. He sold and installed divider block systems and compressors. Roys also taught training classes and authored a training manual on the operation and maintenance of divider block lubrication systems and the monitors used with those systems. Based on his experience with these systems, Roys determined that there was a problem with the existing mechanical no-flow systems that measured lubrication flow within the divider blocks in that they were big, inaccurate, expensive, affected by the temperature variables, and failed to shut down the unit in the event of a malfunction. In the early 1990s, Roys began to conceive of a smaller and cheaper device to monitor and control lubrication that could attach directly to the divider block. To that end, Roys conceptualized a design that would contain a proximity switch with a digital cub counter and light emitting diode (LED) screen that had shut-down capabilities. He spoke of his idea to his employer at UP & S, Mike Huckaba, and for three to five years, they tried to develop a working shut-down system. Roys determined that he lacked the technical knowledge about electronic cir-

cuits necessary to create a working model of his idea. In late 1994, Roys purchased a meter from James Morris Traylor, Jr. He told Traylor that he needed the meter to develop a device that had shut-down capabilities. Roys told Traylor that he was having problems with the size of the device and with incorporating the shut-down function. He asked Traylor if Traylor could put electronics for a shutdown function inside the device illustrated in Defendant's Exhibit 17, which was a cub counter attached to a proximity switch with a plunger. Traylor said that he could not make the device explosion proof and suggested that Roys see Larry Ritchie, who was knowledgeable about electrical circuitry.

Larry Ritchie, the owner and manager of Whitlock Instruments, was widely acknowledged in Odessa, Texas to be an electronics whiz. He worked at Whitlock Watch Clock & Instrument Repairs, Inc. as a teenager, where he worked on watches. He then received a bachelors degree in electrical engineering from Texas Technology College. After college, he worked for Hewlett Packard as a product design engineer in its microwave division for several years. Ritchie then returned to Odessa and purchased the Instruments division of Whitlock, which he renamed Whitlock Instruments.

Roys contacted Whitlock to discuss the possibility of redesigning and miniaturizing the Novatech, a mechanical device for measuring fluid flow with shut-down capabilities. (Pl.'s Ex. 4.) He initially met with Mike Parker, an employee of Whitlock. He then met with Larry Ritchie in a meeting that lasted about an hour. Ritchie was unfamiliar with fluid flow block dividers and the application of Novatech monitors. He had not worked with fluid distribution systems since the 1960's and had never seen the Novatech. Roys explained his

idea for redesigning the Novatech to be digital rather than mechanical. He asked Ritchie to miniaturize the Novatech monitor so that it would be small enough to hook on to the divider block. Within a few weeks, Roys brought Ritchie the device shown in Exhibit 17 (the cub counter attached to a proximity switch which could be hooked on to a divider block). Roys explained that his idea was to put the electronics into it so that it would have an alarm circuit and shut-down function. (Def.'s Ex. 17.)

Ritchie first attempted to redesign the Novatech. This resulted in the DNFT 2, which was a substantially smaller, less expensive and battery-powered fluid flow monitoring device. Roys provided Ritchie with the mathematical formulas used to estimate fluid flow rates in the distribution lines. The DNFT 3 was developed by March 1995. Ritchie and Roys entered into an agreement whereby Whitlock would manufacture the DNFT 2/3 and Roys would sell it for UP & S.

By March 1995, Roys had left his job with UP & S and formed his own company, C.C. Technology, to focus exclusively on the development of the divider block monitoring system. He and Ritchie entered into an agreement to share profits on the DNFT 2/3. Roys operated out of Whitlock's building and shared Whitlock's mailing address. Indeed, he even put a "C.C. Technology" plaque on the outside of the building. The testimony of the witnesses and the documentary evidence show that Ritchie and Roys were in frequent communication and that they collaborated on the development of the DNFT. Ritchie, however, was unhappy that Roys received a greater portion of the profits (70 %) from the DNFT 2/3. Ritchie and Roys worked out an agreement under which they would work to make the product smaller and more reliable, and they would split the profits evenly. In June 1995, Roys wrote Ritchie a check for $2,000 as "earnest money," which was to be an incentive for Ritchie to continue to work on developing a smaller device.

On or around July 4, 1995, Ritchie came up with the idea of putting all of the circuitry into the housing with the proximity switch. He discussed his idea with Roys and experimented with different materials and casings. On July 5, 1995, Ritchie created first a plastic, and then an aluminum prototype of the "housing." He then designed the circuit board, which would fit within the housing and could withstand the temperature and vibrational environment. In a short amount of time, Ritchie completed a working prototype of what would become the patented device.

Roys suggested to Ritchie that the device was patentable and arranged an appointment with Scott Denko, a patent attorney with the firm of Fulbright and Jaworski. Denko asked questions of and provided Roys and Ritchie with an explanation of joint inventorships to determine that they were in fact joint inventors. (Denko depo. at 40–42.) They confirmed to him that they had both contributed to the invention. (*Id.* at 40.) The Court finds that Ritchie's denial that Denko ever explained joint inventorships to him to be unbelievable.

Roys prepared most of the patent application materials given to Denko. Ritchie conceded that Roys drew figures 2, 3, 4, and 5 of the patent and submitted them to Denko. Indeed, he admits that at the time, he did not know and Roys did not explain to him the significance of figure 5. Ritchie guessed that it was an illustration of a design-around feature. Roys, in contrast, testified that figure 5 illustrated claim 4, a closed magnet assembly apparatus he designed to be used in highly sensitive applications in which it was important that the plunger not exit the casing and

potentially displace the lubricants. (Pl.'s Ex. 1, figure 5, claim 4.) Denko corroborated Roys' statements about claim 4 and figure 5. (Denko depo. at 24.)

In September 1995, Roys and Ritchie submitted an application as joint inventors for a patent on the "integrated fluid distribution apparatus and method." Indeed, they both signed a Combined Declaration and Power of Attorney form identifying themselves as "joint inventors" of the "subject matter which is claimed and for which a patent is sought." (Def.'s Ex. 36.) As a part of that Declaration, Ritchie affirmed that all the statements made were truthful:

> I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that there statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

(*Id.*) The patent office did not grant the patent initially, and the application went through various revisions. In 1997, Ritchie and Roys signed another document, the Verified Statement to Establish Small Entity Status, in which they again declared themselves to be joint inventors of the invention. (Def.'s Ex. 14.) Plaintiff Ritchie asserted that he never saw the patent documents before they were filed and that he failed to read both the 1995 and the 1997 declarations before he signed them. The credible evidence showed that Denko sent the application package to Ritchie after explaining joint inventorships to him (Def.'s Ex. 99.) Ritchie was a highly intelligent and meticulous person, and his efforts to convince the Court that he

signed the patent application materials without reading or understanding them were simply unconvincing.

The '372 patent was issued on November 10, 1998. It is undisputed that the device marketed as the DNFT was a success in the marketplace. For five years after Ritchie and Roys filed for the patent in 1995, Ritchie never asserted that he was the sole inventor of the patented device. For example, Ritchie admitted that he was aware of articles in which he and Roys were referred to as joint inventors and that he did not complain to the author or write a letter to the journals. For example, an article in a Compressor Tech magazine published in the fourth quarter of 1996, stated: "The DNFT is the brain child of Curtis Roys and further developed by Larry Ritchie ..." (Def.'s Ex. 76.) A 1996 article in the Oil & Gas Review, which featured a photograph of Roys and Ritchie standing together next to the DNFT, lauds the "joint venture" between Roys and Ritchie. (Def.'s Ex. 75.) In fact, in 1995, the invention originally bore a nameplate identifying it as belonging to Roys.

The business relationship between Ritchie and Roys began to deteriorate by 1998. By November 12, 1998, attorneys for Ritchie and Roys discussed efforts to sell the jointly held patent. (Def.'s Ex. 83.) Sometime around 1999, Roys sued Ritchie in state court to recover profits that he claimed Ritchie had withheld from him.

Nevertheless, even as late as August 11, 1999, Ritchie, through his lawyer Daniel Hollman, advised Roys' attorney that Ritchie was not claiming to be the sole owner of the patent. (Def.'s Ex. 84.)

> I had also cautioned my client [Larry Ritchie] that we did not want to imply a partnership between CC Technology and Whitlock, as the relationship was one of co-owners on a single patent.

*Whitlock does not claim that it is the sole owner of the patent in this case* but it is the sole manufacturer of this product.

(Emphasis added.)

Further, the Court disbelieves Ritchie's contention that he remained unaware of the meaning of joint inventorship until the summer of 1999. Ritchie asserted that he did not understand the requirements for joint inventions until he and his son met with a patent attorney at the firm of Akin Gump, who explained the legal requirements to him. First, Denko contradicted his testimony. Second, Ritchie never explained satisfactorily what he learned that sparked his new recognition that he was the sole inventor of the device represented by the '372 patent.

## III. Conclusions of Law

### A. Legal Standard

The patent laws state that whoever "invents" patentable subject matter is entitled to a patent regarding that subject matter, *see* 35 U.S.C. § 101 (1994), and that when an "invention" is "made by two or more persons jointly, they shall apply for [a] patent jointly." 35 U.S.C. § 116 (1994). Patent issuance creates a presumption that the named inventors are the true and only inventors. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed.Cir.1998). Indeed, "[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence." *Hess v. Advanced Cardiovascular Systems, Inc.*, 106 F.3d 976, 980 (Fed.Cir. 1997) (citations omitted). In *Amax Fly Ash Corp. v. United States*, 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975), the court explained that such a high standard was necessary because, "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been

years earlier, is simply too great to permit a lower standard." Determination of inventorship is a question of law. *Ethicon*, 135 F.3d at 1460.

The "critical question," in determining inventorship is who conceived the subject matter of the claims at issue, whether that subject matter is recited in a claim in an application. *Ethicon*, 135 F.3d at 1460; *Sewall v. Walters*, 21 F.3d 411, 415 (Fed.Cir.1994). Since "conception is the touchstone of inventorship," each joint inventor must contribute to the conception of the invention. *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227–28 (Fed.Cir.1994) (citations omitted). Conception is complete only when "the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Id.* at 1228 (citations omitted). An idea is definite and permanent when the inventor has a "specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue" and the idea must involve a "specific approach to the particular problem at hand." *Id.* at 1229. Accordingly, for the alleged inventor to prove possession of the "complete mental picture of the invention," he must be able to describe his invention with particularity. *Id.*

A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed. *See Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227 (Fed.Cir.1994). "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every

claim of the patent." 35 U.S.C. § 116 (1994). All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed.Cir. 1998) (citations omitted). Indeed, a co-inventor need not make a contribution to every claim of a patent, *see* 35 U.S.C. 116, because a contribution to one claim is enough. *See Ethicon*, 135 F.3d at 1460.

 A person, however, who "merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Garrett Corp. v. United States*, 190 Ct.Cl. 858, 422 F.2d 874, 881 (1970). A person also does not qualify as a joint inventor by "merely assisting the actual inventor after conception of the claimed invention." *Ethicon*, 135 F.3d at 1460. Someone who simply provides an inventor with well-known principles or the state of the art without ever having firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor. *Hess*, 106 F.3d at 981. Moreover, an inventor "may use the services, ideas and aid of others in the process of perfecting his invention without losing his right to a patent." *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir.1985) (quotations omitted).

 An inventor's testimony standing alone does not rise to the level of clear and convincing proof. *Ethicon*, 135 F.3d at 1461, citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir.1993). Because conception is a mental act, courts "require corroborating evidence of a contemporane-ous disclosure that would enable one skilled in the art to make the invention." *Burroughs*, 40 F.3d at 1228 (citations omitted). Whether the inventor's testimony has been sufficiently corroborated is evaluated under a "rule of reason" analysis. *Price*, 988 F.2d at 1195. Under that analysis, "[a]n evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of a [alleged] inventor's story may be reached." *Id.* Corroborating evidence may take such forms as contemporaneous documents and circumstantial evidence. *Ethicon*, 135 F.3d at 1461.

### B. Analysis

The real dispute in this case is over who conceived of the invention embodied in the '372 patent. Indeed, it is clear that with the exception of claim 4, Ritchie reduced to practice all of the other claims in the patent. Both Ritchie and Roys claim to have conceived of the essentials of the invention. The Court finds that Roys conceived of the DNFT generally in that he had a concept of creating an electronic device to measure and control fluid flow that contained a shut-off switch and a counter, and that would attach directly to a divider valve. The issue of whether Roys' ideas crossed the threshold between a design goal and a patentable idea is a hard one to answer, but it is one that the Court need not resolve in this case.

 In order for plaintiff to remove Roys from the '372 patent, Ritchie must prove by clear and convincing evidence that Roys made no contribution to any of the claims in the patent. Here, Ritchie Development has not met that burden with regard to claim 4 of the patent. The Court finds that Roys conceived of and contributed the feature contained in claim 4, which is illustrated in figure 5. *See Ethicon*, 135 F.3d at 1460 (finding that a

contribution to one claim is enough to find co-inventorship).

Claim 4 states: "The apparatus of claim 3 wherein the lever arm plunger is sealed within said magnetic field source housing." (Pl.'s Ex. 1, col. 6, ln. 64–65.) Roys testified that he conceived of claim 4, which he illustrated in figure 5 of the patent. Roys provided Denko with the information disclosed in the patent, which explains that the sealed magnetic housing is designed for use in "highly sensitive applications," such as when an unsealed magnetic housing "may introduce contaminates into lubrication fields." (*Id.*, col. 4, ln. 53–63.) Claim 4 embodies a fully enclosed magnetic housing and assembly to provide a fully sealed intersection between the unit and the assembly. (*Id.* at ln. 59–63.) Unlike the embodiment in figures 2 and 3 of the patent, in the embodiment illustrated in figure 5 as conceived in claim 4, the plunger does not emerge from the sealed assembly:

> Like magnet housing 28, sealed assembly 70 is threaded for insertion into assembly 44 and dimensioned to be sleeved within cavitated structure 12. However, unlike housing 28, a plunger does not emerge from assembly 70. A magnetic plunger 72 within assembly 70 is biased by tension from spring 74 pushing against collars 76 and 78. When assembly 70 is appended to assembly 44, threaded end area 62 is positioned at an end of chamber 46 in an end plug orifice. As piston 50 laterally cycles fluid through chamber 46, piston 50 approaches and recedes from end area 62 of assembly 70. When, during its stroke, piston 50 is proximal end area 62, magnetic plunger 72 is drawn toward cyclically moving piston 50. When piston 50 approaches end area 62, the magnetic attraction between plunger 72 and piston 50 causes plunger 72 to laterally move against the bias of spring 74 thus moving the opposite magnetic field source end 64 of plunger 72. Consequently, magnetic field source end 64 of plunger 72 cyclically actuates reed switch 16 proximally located in surrounding cavitated structure 12. Reed switch 16 is actuated, therefore, in cyclical coincidence with controlled volumetric fluid flow through divider valve assembly 44. As with other embodiments, the cyclical actuation of reed switch 16 is evaluated by microprocessor 18 affixed to cavitated structure 12."

(*Id.*)

In contrast, Ritchie admitted that he did not know why claim 4 was even included in the patent. He surmised that it was merely a design-around feature. That explanation, however, is contradicted by the language contained in the patent itself. Further, Ritchie corroborated that Roys drew figure 5 of the patent, as well as a detailed earlier version of figure 5 (Def.'s Ex. 73.) Moreover, Denko confirmed that Roys said from the inception (without contradiction by Ritchie) that he designed claim 4. (Denko depo. at 24.) Additionally, Denko testified that based on his interaction with the inventors, Roys "certainly" made a contribution to the subject matter of the claims in the '372 patent. (*Id.* at 39, 45.)

The Court therefore concludes that in light of the evidence showing Roys' contribution to the development of claim 4 of the patent, plaintiff failed to prove by clear and convincing evidence that Larry Ritchie was the sole inventor of the '372 patent.

## III. CONCLUSION

For the foregoing reasons, the Court rules in favor of the defendant, Curtis Roys.

### APPENDIX A

"We claim:

1. A fluid-flow machine control signalling apparatus adapted for appendage to a divider valve for evaluation of a selected fluid flow through the divider valve, the apparatus comprising:

a cavitated apparatus protection structure adapted for appendage of the protection structure to a divider valve;

an evaluation circuit disposed within said protection structure and adapted to provide intelligible control date;

a lever arm plunger having a magnetic first plunger end disposed in a cavity of the protection structure, the lever arm plunger being partially emergent from the protection structure and projectable into the divider valve to contact at a second plunger end, a piston of the divider valve to transfer motion of the piston of the divider valve to the magnetic first plunger end disposed in the structure by reciprocation of the piston against the second plunger end and consequent reciprocation in the cavity of the magnetic first plunger end; and

a switch disposed within said protection structure to selectively respond to movement of the magnetic first plunger end with an output signal provided to said evaluation circuit.

2. The apparatus of claim 1 in which the evaluation circuit is controlled with a microprocessor and produces a shutdown control data signal upon violation of a preselected criteria.

3. The apparatus of claim 1 further comprising a magnetic field source housing adapted to append the fluid-flow machine control apparatus to the divider valve and in which the magnetic first plunger end of the lever arm plunger is disposed, said housing being sleeved into said cavity of the cavitated protection structure.

4. The apparatus of claim 3 wherein the lever arm plunger is sealed within said magnetic field source housing.

5. The apparatus of claim 3 wherein the lever arm plunger has a primary end disposed within the housing to move a separate magnetic field source within said housing and a secondary end of the lever arm plunger is disposed against the piston of the divider valve to convey motion of the piston of the divider valve to the magnetic field source within the magnetic field source housing.

6. The apparatus of claim 1 further comprising a display articulating a selected set of said intelligible control data.

7. A method of deriving data related to a selected fluid flow through a divider valve in a fluid distribution system, said method comprising the steps of:

providing a cavitated structure;

disposing a microprocessor-directed circuit within said structure;

positioning a moveable lever arm plunger having a magnetic first end to place the magnetic first end within a cavity of said structure;

positioning a switch within said structure to generate switch signals responsive to motion of said magnetic first end in said cavity;

conveying a motion representative of said selected fluid flow through a divider valve to said magnetic first end of the lever arm plunger by placement of a second end of the lever arm plunger against a reciprocal fluid-responsive piston of the divider valve to cyclically move the magnetic first end of the lever arm plunger in the cavity of the structure in response to motion of the piston of the divider valve to generate said switch signals;

evaluating said switch signals with said microprocessor directed circuit to

derive intelligible selected fluid flow-related data.

8. The method of claim 7 in which said intelligible selected fluid flow-related data is stored in a random access memory site and available for downloading by a peripheral computer system.

9. A method for deriving data indicative of a selected fluid flow through a divider valve, said method comprising the steps of:

 providing a pressurized fluid flow to a divider valve chamber;

 cyclically transposing a piston within said divider valve chamber to articulate a predetermined volume of fluid through said chamber;

 appending a cavitated structure to the divider valve;

 disposing a microprocessor-directed evaluation circuit substantially within said structure;

 positioning a moveable magnetic field source within a cavity of said structure;

 positioning a switch within said structure to generate actuation signals responsive to motion of said moveable magnetic field source;

 transferring motion of said piston in the divider valve chamber to said moveable magnetic field source within the cavity of the structure with a lever arm plunger disposed at a first end to move the moveable magnetic field source in the structure and at a second end against the piston of the divider valve to generate said actuation signals;

 evaluating said actuation signals with said microprocessor-directed circuit to derive data indicative of the selected fluid flow through the divider valve.

10. A method of evaluating a fluid distribution system, said method comprising the steps of:

 providing a pressurized fluid flow to a chamber;

 cyclically transposing a piston within said chamber to articulate a predetermined volume of fluid through said chamber;

 appending to the chamber, a cavitated structure bearing within, an evaluation circuit responsive to the motion of the piston through lever arm transference of the motion of the piston in the chamber to a magnetic field source within the structure provided by a lever arm having a magnetic first end disposed in the structure and a second end disposed against the piston of the chamber, the magnetic field source provided by the magnetic first end of the lever arm being stimulative of a magnetically-responsive switch whose signals are evaluated by the evaluation circuit to provide signals indicative of the pressurized fluid flow in the chamber.

11. A fluid-flow machine control signalling apparatus for evaluating a selected fluid flow in a divider valve, the apparatus comprising:

 a cavitated apparatus protection structure;

 an evaluation circuit disposed within the protection structure and adapted to provide intelligible machine control data;

 a magnetic field source housing selectably positioned in the protection structure and having a magnetic field source-receptive well providing a motion field for a magnetic field source, the housing being adapted for appendage to the divider valve;

 a magnetic field source disposed in the well of the housing, the magnetic field source being moveable in sympathy with a selected fluid flow through the divider valve through lever arm

transference of motion from a piston disposed within the divider valve to the magnetic field source disposed within the cavitated protection structure by a lever arm plunger disposed within the cavitated protection structure by a lever arm plunger disposed at a first end against the magnetic field source and at a second end against the piston;

a magnetically-responsive switch disposed within the cavitated apparatus protection structure to selectively respond to the sympathetic movement of the magnetic field source with an output signal provided to the evaluation circuit.

12. The apparatus of claim 1 wherein the evaluation circuit includes a memory site from which may be retrieved said intelligible control data.

13. The apparatus of claim 1 further comprising a display articulating a selected set of intelligible control data.

14. The method of claim 10 further comprising the step of providing a display for indication of the signals indicative of the pressurized fluid flow in the chamber."

(Pl.'s Ex. 1, col. 6–8.)